DETERMINED IN THE

# SECOND DEPARTMENT,

AT

# GENERAL TERM,

September, 1880.

---

THE PEOPLE OF THE STATE OF NEW YORK *ex rel.*
JOHN W. FLAHERTY AND GEORGE C. BENNETT, *v.*
HON. JOSEPH NEILSON, CHIEF JUDGE OF THE CITY COURT OF
BROOKLYN.

JOHN W. FLAHERTY AND GEORGE C. BENNETT, PLAINT-
IFFS IN ERROR, *v.* THE PEOPLE OF THE STATE OF NEW
YORK, DEFENDANTS IN ERROR.

*City Court of Brooklyn—criminal trials in it are reviewable on writs of error*
*and certiorari issued from the Supreme Court—when a conviction will be set*
*aside because of the improper treatment of a juror.*

Writs of error and of *certiorari* will issue from the Supreme Court to review
a trial and conviction had in the City Court of Brooklyn, upon an
indictment found in the Court of Sessions and transferred to the City
Court for trial.

During the trial of the plaintiff in error upon an indictment, charging him
with a conspiracy to defraud the city, the judge called one of the jurors
and the counsel for the prosecution and the defense into a room, and after
showing to the juror an anonymous letter, which stated that the juror
had been in the habit of playing cards with the sons of the plaintiff in
error, asked him if he knew who wrote it, to which the juror replied, that
he did not. The judge then said, that it was "very embarrassing and
unpleasant, and, toward a juror, monstrously unjust, and a serious imputa-
tion." The plaintiff in error was not present, and the judge said, when

HUN.—VOL. XXII.        1

the counsel for the plaintiff in error attempted to speak, that "he did not expect counsel to make any observations." There was no proof that the facts stated in the letter were true, nor was the juror asked if they were true. *Held*, that the conviction should be reversed, as the tendency of this action, by the judge, was to dominate the juror's free-will, and terrify him into a verdict for the people.

THIS case came before the court both by a writ of error and by a writ of *certiorari* to the City Court of Brooklyn, for the purpose of reviewing the proceedings had upon the trial and conviction of the relators upon an indictment charging them with a fraudulent conspiracy to defraud the city of Brooklyn.

During the progress of the trial the counsel for the plaintiffs in error were notified to appear before the presiding judge after the adjournment of the court. Pursuant to the notification they attended in a private room before the said judge, with the counsel for the People, one of the jurors, John R. Wilmer, and the official stenographer of the City Court. Neither of the defendants were present or had any notice of the meeting.

The following transaction then occurred:

*Judge.*—I want to ask this juror about this letter (producing it), and I could not do so, of course, except counsel were present. (Addressing the juror:) I simply want to ascertain if you know the handwriting of this (handing him the letter)? Be kind enough to look at this. It is anonymous, and I am very anxious to find out who wrote it.

Juror Wilmer looked at the letter and said: "No, sir; I do not."

*Judge.*—Never saw the letter?

*Juror.*—No, never.

*Judge.*—This last clause of it, just read it. If you can in any way recall, or hereafter if you can detect the handwriting, I would like to send a summons and have the party brought up.

*Juror.*—Yes, sir. (He then read:)—"Another thing. Are you aware that the juror, Wilmer, is a chum of the Bennetts, sons of George C., with whom he has been in the habit of playing cards almost nightly? I notice that since the commencement of this trial that he is not seen with them at the old haunts as formerly.

The writer has no animosity to Bennett or Flaherty, but thinks it right to post you in relation to the above, in the interests of the city."

*Judge.*—My simple question was whether you knew the writing?

*Juror.*—No, sir.

*Judge.*—I want to put it to you, showing my respect to you entirely, and I could not do it without asking the counsel to come in. It looks rather formal, but it is the only way I could do it.

*Juror.*—(He was still holding the letter.) I don't recognize the writing at all.

*Judge.*—That is all I can say to you. It is very embarrassing and unpleasant, and toward a juror monstrously unjust and a serious imputation.

*One of the Counsel for the Accused.*—I don't understand it. I confess I don't understand by what right your Honor can compel a juror—

*Judge.*—I don't want any observations at all.

*Counsel.*—I confess it is an unusual proceeding. If your Honor receives a letter of that kind I don't think you should call the attention of a juror to it.

*Judge.*—I did not expect counsel to make any observation.

*Counsel.*—I don't know what we are here for then.

*Judge.*—If you think I have committed an error I am sorry for it.

*Counsel.*—Well, it has a tendency seriously to prejudice my clients.

*Judge.*—I don't think so.

*Counsel.*—Well, I do.

*I. S. Catlin,* district attorney, for The People.

*Ira Shafer* and *Jesse Johnson,* for the plaintiffs, in error.

BARNARD, P. J.:

Is this appeal properly in this court? The indictment was found in the Court of Sessions of Kings county; it was transferred by order to the Court of Oyer and Terminer, and the demurrer to the indictment overruled, and then it was sent back to the Sessions.

By the Court of Sessions it was transferred to the City Court for trial, and there tried and the defendants convicted. By the law establishing the City Court of Brooklyn (L. 1849, ch. 125, § 11), the City Judge, with the aid of a mayor and an alderman, or with the aid of two aldermen, could try all criminal cases which could be tried by the Court of Sessions. There was then only one City Court judge, and the appeals from their judgment in a criminal case went to the General Term of the Supreme Court, not by force of the law of 1849, which was silent, but by force of the Revised Statute, which clothes the Supreme Court with jurisdiction over all writs of error and writs of certiorari. In 1870 the City Court was reorganized with three judges, and with a General Term. The section in respect to criminal jurisdiction was amended so as to give any of the judges of the City Court power to hold a court of criminal jurisdiction with the same powers as Courts of Oyer and Terminer. Neither under the law of 1849 nor under the law of 1870 could indictments be found in the City Court. The judge could try indictments sent to the City Court for trial, either by the Court of Oyer and Terminer or Sessions. The law of 1870 is also silent with reference to appeals in criminal cases when tried by one of the judges of the City Court. I do not think section 6 of the act of 1870 (L. 1870, ch. 470), designed to reach appeals in such cases. The language is, " An appeal upon the law may be taken to the General Term of said court from a judgment entered upon the report of referees, or the direction of a single judge of said court, in all cases and upon the facts where the trial is by the court or referees." These words, " judgment upon report of referee, or by direction of court," have a different meaning and apply only to civil trials. In criminal cases they have no relevancy. There is, therefore, no power to warrant the return of a writ of error to the City Court to review a trial had before one of the judges. It cannot be supposed that the Legislature designed to prevent an appeal. The City Court, at General Term, cannot review it unless power is given by law for that purpose; as we have seen, there is no such power. There remain but two ways of reaching an appellate court; either a writ of error or certiorari will bring the record and exceptions directly from the City Court to this court, or an order must be ob-

tained from the City Court, sending back the record, to the end that the writ may reach the court which sent the indictment to the City Court for trial. I think the writs of error and certiorari reach the City Courts in criminal cases. The Supreme Court has still power to review all criminal trials, unless the power has been taken away. This has not been done in express terms, nor by words which give the power to another court. The writ of error is, therefore, properly in this court.

Upon the merits I think this judgment should be reversed for improper interference with the juror, Wilmer. While the case was being tried, it seems that some one had sent to the presiding judge an anonymous letter, informing the judge that Wilmer had been playing cards with the sons of one of the defendants before the trial commenced. By direction of the judge, the juror is taken into a private room with a stenographer, and the letter is shown to him, and he is asked if he knew who wrote it; he replied, that he did not; he is then told to read the last clause, which is the one containing the charge about card-playing with the young Messrs. Bennett, and then, after reading it, he is again asked if he knew who wrote it; he made the same reply, and the judge then told him "it was very embarrassing and unpleasant, and, toward a juror, monstrously unjust, and a serious imputation." There was nothing in the letter either unpleasant or serious. A juror may play cards with young companions, and afterwards be a good juror to try their father for an alleged criminal offense, if not challenged by the district attorney. The counsel for the defendant attempted to say something in defense of the rights of his clients, the accused, and he was told by the judge that he "did not expect counsel to make any observations." The defendants were not present and were not invited. The attorney, so far as the case shows, had no authority to appear for them in their absence upon this proceeding. There is no proof of the truth of the facts stated in the anonymous letter, and the juror was not asked if they were true. The tendency was to dominate the juror's free will and to terrify him into a verdict for the people.

Conviction reversed, and a new trial granted.

GILBERT, J., concurred.

Present—BARNARD, P. J., GILBERT and DYKMAN, JJ.

Judgment reversed, and new trial granted.